UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DIANE TRISCH,

        Plaintiff,                      Case No. 06-10133

vs.

                                      DISTRICT JUDGE ROBERT H. CLELAND
JO ANNE B. BARNHART,              MAGISTRATE JUDGE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I.    BACKGROUND**

Diane Trisch brought this action under 42 U.S.C. §405(g) and §1383(c)(3) to challenge a final decision of the Commissioner denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) Benefits under Titles II and XVI of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

**A.    Procedural History**

Plaintiff applied for benefits in September 2002,[1] alleging that she has been disabled and unable to work since March 31, 1986, due to a back impairment (R. 43-47, 61, 660-62). The Social Security Administration [SSA] denied benefits initially on January 17, 2003 (R. 29-32,

---

[1] Her protective filing date for both DIB and SSI is June 20, 2002 (R. 47, 662).

664-667).[2]  A de novo hearing was held on October 6, 2004, before Administrative Law Judge [ALJ] Neil White (R. 671-90).  Plaintiff was represented by her current counsel and VE Pauline McEachin testified (R. 671).  On November 23, 2004, ALJ White found that Plaintiff could perform the full range of light work and accordingly was not disabled (R. 17-23).  On November 30, 2005, the Appeals Council denied review (R. 6-8).

> **B.**     **Background Facts**
>
>> **1.**     *Plaintiff's Application & Past Work History*

In Plaintiff's August 22, 2002, Disability Report she describes her disability as her "back" (R. 61).  The "severe pain" limited her ability to work.  On February 7, 2003, Plaintiff filed her Request For Hearing stating that she "ha[s] been totally disabled since 1986" (R. 33).  Further, in her Statement When Request for Hearing is Filed, and the Issue of Disability she states that "activity increases the pain" (R. 74).

Plaintiff last worked on a regular basis from 1982[3] to 1986 on the assembly line for General Motors  (R. 49 and 62).  She had several failed work attempts in 1997 and 2000  (R. 70).  Her last date of insured status is March 31, 1992  (R. 18 and 48).

>> **2.**     *Plaintiff's Hearing Testimony*

Plaintiff testified that she was forty-nine years old at the hearing and recently moved into her daughter's house in Bay City. (R. 674).  She has a tenth grade education and last worked full-time at General Motors in March of 1986.   She stopped working after a car accident in the

---

[2]It appears a 1994 SSI claim was also denied at the initial determination and not pursued (R. 56).

[3]Plaintiff indicated on her Disability Report that she began at General Motor sin 1997 (R. 62).

parking lot at work (R. 675). She reported being paralyzed for several years. General Motors would not let her return after the accident because she had undergone four back surgeries. Despite doctor's advice to the contrary, she tried to go back to work after her third surgery but after six months she needed a fourth surgery (R. 686-87). She stated that she tried to return to work after her last surgery, but they would not let her return (R. 687).

Plaintiff's back surgeries resulted in removal of her third through fifth lumbar disks (R. 675). During the first and third operation, the doctors tried to repair her back. During the second and fourth operations, degenerated disks were removed. She has never had any hardware put in her back.

Plaintiff stated that she was five feet, six inches tall, possibly shorter due to the removal of her disks, and she weighs about one hundred and ten pounds. (R. 676). She explained that she was in a wheelchair at the hearing because she has very little feeling in her legs and they go numb. It is hard for her to get up and walk around, and the wheelchair makes it easier. While she has a wheelchair at home, but she does not normally sit in it.

In addition to her back problems, Plaintiff has numbness in her left arm down to her fingertips. About three or four months prior to the hearing her whole hand started going numb when she holds something for a couple minutes (R. 677). Plaintiff treated with her surgeon, Dr. Stewart, but she is no longer treating with anyone due to lack of money and insurance. Dr. Awerbuch was her treating physician (R. 679).

Plaintiff described a typical day:

> I get up and watch TV in the morning, read the newspaper. I lay down and take a nap, you know, if I'm hurting, you know, the pain varies from day to day. Some days are worse than others. Some days, some days it just doesn't matter what I do, I just -- I'm miserable, you know, it just -- it hurts so bad. And then some days it

> kind of slacks up a little. I walk around and I really don't do much, you know. My daughter kind of takes care of me. She helps me with taking baths and, you know, doing - - she does everything in the house. I sit with my grandkids and read to them or, you know, play a card game with them or - - I really don't do anything. I have lunch, you know. I usually take two naps a day, lay down because I can only sit up for so long, then I have to lay down. It just hurts. So then we dinner [sic] and, you know, kind of go tot bed. I'm up and down all day. I try to, I try to walk, you know, figure maybe it will help. But some days it just doesn't matter.

(R. 677-78). She testified that her condition is worsening and both her legs and her arm are numb (R. 679).

Plaintiff she was able to see Dr. Stewart once or twice after her last surgery in December 1995, while she still had insurance from her work at General Motors. She does not receive food stamps, FIA assistance, worker's compensation, or a pension (R. 680).

Plaintiff does not sleep well at night because she cannot get comfortable and experiences pain. She naps 1-3 hours at a time during the day. She can sit for about half an hour before she has to get up or go lay down, which sometimes helps and sometimes does not (R. 683). She has trouble standing and could only stand in one location for ten minutes before needing to sit (R. 680-81). She "just can't walk," and has to hang on to the wall to walk through her home, otherwise she will fall over for no reason (R. 681-82).

She denied an ability to lift a gallon of milk due to the numbness in her hand (R. 681). She explained that before her hand started going numb she did not lift anything either because it pulled everything. She can lift a plate and silverware (R. 682). Her back pain radiates down her left leg, but for the last three or four months both legs were affected. Stairs are difficult requiring her to hold onto the rail for her three front porch steps.

Plaintiff testified that she cannot bend or squat, and if she does try to squat, someone has to help her back up (R. 683). Nor can she push or pull. Her daughter does everything for her,

including grocery shopping and cleaning. Her daughter even helps her bathe, put on socks, shoes, and pants (R 685). Her son-in-law and the kids do her yard work (R. 683). While she has a driver's license, she has not driven recently because when she sits, she hurts (R. 684). She rode with her daughter to the hearing.

Plaintiff reported not having a lot of energy. She stated that with her depression, she has difficulty paying attention (R. 685). She has not treated with a psychiatrist or psychologist.

### 3. *Medical Evidence*

In 1984 Plaintiff was in a motor vehicle accident resulting in a lumbar injury (R. 233). Medical records for her treatment are not part of the record.

Plaintiff was admitted to Luke's Covenant Hospital on June 11, 1987, and discharged on June 17, 1987 (R. 77-84). At that time she had a "[l]umbar laminectomy and disketomy, L5-S1, left." (R. 78). On August 2, 1987, she returned to the Emergency Room at Luke's Covenant Hospital with postoperative pain (R 85).

From August 9, 1990, until August 14, 1990, Plaintiff was treated at St. Mary's Hospital (R. 86-139). Her final diagnosis was "[r]ecurrent disk herniation, L5-S1 on the left. Lumbar disk herniation, center at the left side with far out lateral disk herniation at the L4-5 on the left side" (R. 88). She had a "lumbar laminectomy at multiple levels, L5-S1 and L4-4 from left sided approach." *Id.* Her "outcome was slightly improved." *Id.*

On November 16, 1992, Plaintiff was treated by Gary P. Colon, M.D. at the University of Michigan Hospital, but there are no documents on this in the record.

Plaintiff was admitted to Bay Medical Center on January 23, 1994 and discharged on February 1, 1994 (R. 140-264). She went to the Emergency Room after a slip and fall, (R. 231),

and was admitted to the hospital with "severe low back pain and leg weakness" (R. 141). She was treated with physical therapy (R. 141, 156-60). Plaintiff had MRIs, EMGs, and CT Scans performed (R. 177-78, 185-86, 189-94, 257-58). Her discharge diagnosis was "[a]cute exacerbation of lower back pain with radiculitis. History of three prior back surgeries. Vertigo. Smoking history." *Id.* Further, during this hospital stay, Plaintiff began treatment with neurologist, Gavin I. Awerbuch, M.D. (R. 141, 144-45, 186-87).

During this stay at the hospital, Plaintiff underwent neurological assessment (R. 181, 260). On January 28, 1994, doctor's notes indication that Plaintiff stated that she was psychic and had "formulas for NASA and the DOD" (R. 172). A consultation dated January 27, 1994, and February 10, 1994, states that "Patient was uncooperative and did not participate in psychological tests after initial interview" (R. 155).

She returned to the Emergency Room at the Bay Medical Center on February 15, 1994, experiencing "[b]ack pain with muscle atrophy, left calf" (R. 265-67). The same year, on November 7, Plaintiff returned to the same facility with "[a]cute sciatica" (R. 268-70).

From March 2, 1994, until November 30, 1994, Plaintiff continued treatment with Dr. Awerbuch (R. 271-73). During a visit on March 2, 1994, Plaintiff was in severe pain, crying, and in a wheelchair (R. 273). She had a negative workup and a "basically normal neurological exam." (R. 272). Treatment notes from May 9, 1994, indicate that Plaintiff thought she could return to work, which Dr. Awerbuch approved with "restrictions, including no lifting more than 20 pounds and no repetitive bending" (R. 272).

Yet, on November 30, 1994, Dr. Awerbuch thought Plaintiff should be admitted to the hospital with left S-1 radiculopathy to rule out recurrent disc herniation, but she wanted to try out-

patient therapy (R. 271).  Dr. Awerbuch scheduled an MRI and EMG, prescribed Valium (5mg), Lodine (400mg), and Prednisone, and noted that he wanted Ms. Trisch "to stay in bed with her legs kept in a flexed or neutral position over the next 2-3 days." *Id.*

On December 8, 1994, Plaintiff still had left S-1 radiculopathy as well as chronic pain syndrome and depression (R. 274).  Thus, Dr. Levin noted "Due to unrelenting pain and no response to out-patient treatment, the patient will be admitted to the hospital for further pain management and neurological evaluation." *Id.*

Plaintiff stayed at Bay Medical Center from December 8 - 22, 1994 (R. 275-403).  An MRI on December 15, 1994, showed a "[s]mall extruded herniated disc fragment on the left side at L5-S1 with some mild epidural scarring that impinges upon the left S1 nerve root pouch" (R. 342).

Following emergency room visits on January 9 and January 16 to get more pain medication, she awaited her surgery scheduled for the end of the month (R. 405 and 409).  She was admitted again, January 30, 1995, for a revision of lumbar laminectomy left L5-S1, fascial fat graft L5-1 (R. 419-78).  Dr. M. C. Stewart noted that Ms. Trisch "had a tremendous amount of scar tissue." Dr. Stewart removed a loose disc that was significant from the disc space and was a free fragment (R. 423).  After her surgery, Dr. Awerbuch reported that "The patient appears to be stable postoperatively.  I would recommend that she attend a postoperative back therapy program.  The prognosis in this case is guarded since she has not responded to two surgeries in the past, but we will continue to be hopeful" (R. 426).  She was discharged on February 2, 1995 (R. 420).

She was an outpatient on January 20, 1995 at the same facility, for a herniated lumbar disc (R. 411-18).  She was admitted again on August 31, 1998, until September 6, 1998 (R. 532-

7

621).  Her assessment was "Bilateral pneumonia; Back Pain with new onset uniary incontinence and bilateral foot drop; Leikocytosis with bandemia; Hyperpyrexia; Generalized malaise with photophobia; Tobacco dependence; [and] Somatic dysfunction of the lumbosacral spine." (R. 539).

Additional medical records show that Plaintiff also visited the Emergency Room at Bay Medical Center several times from 1995 until 1996, and again in 1997, 1998 and 2000 (R. 404-10, 479-531, 622-43).

Emergency Room Visits
1995-1996

| Date | Diagnosis | Page |
| --- | --- | --- |
| January 9, 1995 | acute back pain and rupture lumbar disk per history | R. 405 |
| January 16, 1995 | acute exacerbation, lumbar disk disease | R. 409 |
| February 8, 1995 | post surgical lumbosacral pain | R. 480 |
| June 3, 1995 | acute low bak strain, history of chronic back pain | R. 483 |
| July 3, 1995 | acute exacerbation, lumbar disc disease | R. 486 |
| August 23, 1995 | acute low back strain | R. 489 |
| September 11, 1995 | smoke inhalation | R. 492, 497 |
| February 6, 1996 | costochondritis, smoker | R. 500 |
| May 6, 1996 | acute low back strain | R. 506 |
| May 24, 1996 | motor vehicle accident, closed head injury, cervicolumbar strain | R. 509 |
| September 9, 1996 | acute exacerbation lumbar disc disease | R. 515 |

| June 14, 1997 | alleged criminal sexual assault | R. 518 |
|---|---|---|
| March 8, 1998 | laceration, right hand | R. 529 |
| August 31, - September 6, 1998 | bilateral pneumonia, exacerbation of chronic back pain | R. 541-42 |
| December 10, 1998 | pneumonia | R. 624 |
| January 31, 2000 | acute bronchitis | R. 632 |
| March 27, 2000 | Plaintiff thought she had pneumonia | R. 640 |

    **4.**    *Vocational Evidence*

Pauline McEachin, a vocational expert [VE], testified at the hearing. (TR 688-89). ALJ White asked the VE virtually no questions, other than to describe Plaintiff's background and education. (TR 688). The VE stated that,

> She's worked in the capacity of automotive assembly line worker. Exertional level, light to medium and it's unskilled. And, Your Honor, I'm not sure to include, if it's past relevant work if she's worked in retail sales. That would be an exertional level of light and unskilled.

*Id.* The VE also confirmed that she has a 10th grade education. *Id.*

Plaintiff's counsel then questioned the VE. (TR 689). Counsel asked

> if an individual was limited to sedentary work and needed the option to sit or stand, no bending, squatting, pushing, pulling and no stairs, ladders, no crawling, the individual needed to have the occasion throughout the day at various times to lay down up to anywhere from 15 to 30 minutes at each, each time to alleviate pain or discomfort, and that as a result of chronic pain and/or fatigue from the condition, the individual would be unable to maintain sufficient concentration, persistence or pace to perform even simple, basic tasks eight hours a day, five days week, would there be any jobs within the economy past or otherwise?

*Id.* The VE stated, "that would preclude all work if you can't be on task during the day at least 50, you know, 60 percent of the time, and if you had to take unscheduled breaks to lie down, that

would preclude all work."

### 5. *The ALJ's Decision*

After correctly noting Plaintiff's Title II insured status extended only "through March 31, 1992," ALJ White found that Plaintiff met the disability insured requirements of the Act through the date of the decision, nonetheless he also found that she had not engaged in substantial gainful activity since the alleged date of disability onset in March 1986 (R. 18).

The ALJ found that "[t]he medical evidence indicates that the claimant has status post lumbar surgery times 4, impairments that are 'severe.'" (R. 20, 22). The severity of the claimant's conditions did not meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, of Regulations No. 4 (20 C.F.R. § 404.1520(d)) (the "Listing").

ALJ White found that Plaintiff's allegations regarding her limitations were not fully credible (R. 22). Plaintiff has the residual functional capacity (RFC) "to perform the full range of light work." (R. 23). Given, her age, education, work experience, and her RFC, Plaintiff was "not disabled" pursuant to Medical-Vocational Rule 202.17 (R. 23).

## II. ANALYSIS

### A. **Standard Of Review**

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting*

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[4]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

    B.    **Factual Analysis**

In her motion Plaintiff argues that  "the Commissioner erred as a matter of law by forming an inaccurate residual functional capacity and using Medical-Vocational Rule 202.17 in denying Ms. Trisch benefits."[5]  In the last decade or so few ALJ's who have a VE testify rely exclusively on the Medical Vocational Guidelines as more than a framework for decision making, even for

---

[4] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

[5] Plaintiff's Motion for Summary Judgment and Brief filed May 4, 2006, (hereinafter "Plaintiff's Brief") at page 6.

younger workers, as here, when it a hypothetical question with weight restrictions, certain postural limitations and a sit/stand option generally yields a VE response showing a significant number of specific light or sedentary jobs the hypothetical work can perform. Exclusive reliance on the grid is commonly an invitation of a remand by a federal court.

>Here ALJ White noted:
>
>While the claimant required significant treatment for lumbar pain in the past, there is no indication of ongoing treatment for her back. The record does not indicate any significant medical restrictions regarding her back. When the claimant was complaining of lumbar pain she generally went [to] the Emergency Room for treatment. However, there were often very large gaps of time between these Emergency Room visits and her current allegation are unsupported by objective medical data. While she has some limitations related to her prior lumbar surgeries, she is not totally disabled.

(R. 20)

He took her exertional limitations into account in finding that she could not perform her past relevant work and in limiting her to light exertional work. In May 5, 1994, when Plaintiff indicated to Dr. Awerbuch her belief she could return to work his "written restrictions" only included "no lifting more than 20 pounds and no repetitive bending" (R. 272). While Plaintiff did have a regression after this regarding her back, these are the only work restrictions placed on Plaintiff by a treating source. While it is understood that Plaintiff has no medical insurance and thus may have foregone routine medical treatment with a medical provider who would have provided her more favorable current evidence, the record shows that Plaintiff does get medical care when indicated in visits to the emergency room. While her counsel notes that several of these did relate to her back, many were related to pulmonary problems likely exacerbated by her decades of significant smoking. An examination of the back related ER visits also does not undermine ALJ White's belief that after her fourth back surgery, Plaintiff's back problem was

sufficiently improved to accommodate light work.  While he might have been prudent to have adopted Dr. Awerbuch's restriction on bending into a hypothetical question, the question before this Court is whether he was legally required to have included that non-exertional limitation in his hypothetical question.

After Dr. Stewart removed the loose disc fragment in his early 1995 revision of her lumbar laminectomy at L5-S1, Plaintiff's significant problems with her back improved significantly except for certain isolated incidents that exacerbated them.  It was this lack of current medical history showing a significant ongoing back limitation and related pain that left ALJ White unpersuaded by Plaintiff's extensive claims at the October 2004 hearing regarding her subjective symptoms and her claimed limitations which he found not credible.

Yet, in August of that year she was seen in the ER for "acute low back strain" when she "[f]ell backward and landed on her back" (R. 489).  She got a Demerol and Vistaril shot and pain medication.  When seen in September 11, 1995, for smoke inhalation while in her attic trying to put out a fire, only her history of back problems, and no specific complaints regarding her back were noted (R. 492).  It was stated: "Current medications none" suggesting that Plaintiff was getting along without prescription pain medication. *Id.*

A May 6, 1996, ER visit was for back pain with an unexplained cause that she experienced at 2:00 AM. (R. 506).  While tenderness was found in the lower paraspinous muscles, there was no numbness or tingling, nor any motor or sensation difficulties that would suggest some neurological problem related to her former disc impairment. *Id.*

Her May 24, 1996, ER visit was because she had been in an automobile accident (R. 509).  X-rays showed her prior lumbar fusion and some straightening of the cervical spine, "CT

head was negative" and she was given pain medication for her closed head injury and cervicolumbar strain caused by the motor vehicle accident. *Id.*

Her September 9, 1996 ER visit noted that the "only medications (sic) she is on at home now is Ultram and she has been using that as recently as today and that usually that helps"(R. 515). That day it was not and when that happened she would come to the hospital "and usually a shot of Demoral and Vistaril will help." *Id.*

Her June 14, 1997, ER visit was for her having been sexually assaulted when she was walking home alone at 2 A.M. (R. 518). This was a terrible incident in which Plaintiff was taken out of town, twice forced to have oral sex and thereafter vaginal sex in the back seat of a car, and Plaintiff thereafter fought the rapist in the back seat for a significant period while being returned to town with his accomplice driving. While this incident was a terrible misfortune, the medical record is significant in the lack of complaints about any back problems after this extraordinary ordeal nor does she appear to have requested or received any pain medication. Examination of her extremities showed "full range of motion, good strength and coordination." *Id.* It is significant that the ALJ specifically mentions no medical records related to "lower back pain during 1997" (R. 20).

On March 8, 1998, when she was seen in the ER for cutting her "right hand while washing dishes" the record shows "[s]he is on no medications" (R. 529)

The final ER visit noted by Plaintiff's counsel was the August 31-September 6, 1998, admission primarily for shortness of breath, and pneumonia but also for "exacerbation of chronic back pain" (R. 541-52). As in September 1995 and March of 1998, the record shows that she was on no medications at the time of admission (R. 538). Again the back pain was triggered by

some current incident – this time "a physical altercation with her daughter two days" earlier and she had "been in pain since then" (R. 541) (*See also* R. 533, "She is complaining of low back pain as a result of a fight with her daughter." She again got a shot of Demoral and Vistaril (R. 542), but her medical care requiring the hospital admission was intravenous medication to treat her pneumonia (R. 540). The medical records also note "she works as a bartender" (R. 538)

An ER trip not noted by Plaintiff's counsel was the December 10, 1998 trip for pneumonia, when Plaintiff was again "not on any medicine" and except for the pulmonary problem, "[a]ll other systems reviewed are normal" (R. 623).

Based on the recent medical evidence, a reasonable fact-finder could conclude, that – in the absence of falls, car accidents, or altercations – Plaintiff's back impairment does not preclude her performing a full range of light work on a sustained basis. To be disabled, the disabling condition must last or be expected to last for a 12 month duration. A reasonable fact finder could thus find that short term set backs – caused by non-ordinary, non-recurring events such as falls, car accidents, or altercations – do not establish the required ongoing limitations needed to establish disability. Based on the current medical history, a reasonable fact finder could question Plaintiff's credibility concerning the severity of her limitations such as the inability to lift an 8 pound gallon of milk, needing to use a wheelchair, needing help bathing and dressing, and having trouble standing and walking.

Based on the current record there is substantial evidence to uphold ALJ White's rejection of Plaintiff's credibility with respect to her capacity to perform the physical demands of a full or wide range of light exertional jobs. Thus, there is substantial evidence to uphold ALJ White's determination to direct a finding of not disabled based on grid listing Rule 202.17 for unskilled

light exertional jobs (R. 23).

### III.   RECOMMENDATION

For the reasons stated above, It is RECOMMENDED that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's motion for summary judgment be DENIED .

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

**Note:** any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated: December 27, 2006                                       s/ Steven D. Pepe
Flint, Michigan                                                            United States Magistrate Judge

**CERTIFICATE OF SERVICE**

I hereby certify that on **December 27, 2006**, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Janet L. Parker, AUSA, Mike E. Lupisella, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: Social Security Administration - Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, Il 60606.

                                                s/Tammy Hallwood
                                                Deputy Clerk